## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RICHARD D. BURKINSHAW, | ) | CASE NO. 4:10CV3180 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.* The Court has carefully considered the record and the parties' briefs,[1] and the decision of the Commissioner will be affirmed for the reasons discussed below.

## PROCEDURAL BACKGROUND

The Plaintiff, Richard D. Burkinshaw, filed for disability benefits on January 16, 2008. (Tr. 44, 46.) His application was denied initially and on reconsideration. (Tr. 48, 55.) On October 20, 2009, an administrative hearing was held before Administrative Law Judge ("ALJ") Raul C. Pardo. (Tr. 24-43.) On November 20, 2009, the ALJ issued a decision concluding Burkinshaw is not "disabled" within the meaning of the Act and therefore is not entitled to disability benefits. (Tr. 9-16.) The ALJ determined that, although Burkinshaw suffers from severe impairments and cannot perform his past

---

[1]The scheduling order clearly stated that the case would be submitted after the filing of the Defendant's brief. (Filing No. 11.) Therefore, the Plaintiff's reply brief (Filing No. 16), filed without the Court's permission, was not considered.

relevant work, he has the residual functional capacity to perform light work, for example as a parking lot attendant or a price tagger.  (Tr. 11-16.)  On July 17, 2010, the Appeals Council denied Burkinshaw's request for review.  (Tr. 1, 5.)  Burkinshaw now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration.  (Filing No. 1.)

Burkinshaw claims that the ALJ's decision was incorrect because the ALJ: (1) failed to accept the opinion of his treating physician, Dennis P. McGowan; and (2) did not apply the framework set out in *Polaski v. Heckler,* 739 F.2d 1320 (1984).

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Burkinshaw alleges that his disability began on April 4, 2006, due to back, neck, and arm impairments and depression.  (Tr. 114, 150.)  Burkinshaw is a high school graduate who worked as a weatherization technician before the onset of his alleged disability.  (Tr. 27, 41.)  He was fifty-one years old when the ALJ's decision was issued.  (Tr. 44.)

**Documentary Evidence**

On January 24, 2006, about five weeks before his alleged onset date of disability, Burkinshaw saw Dennis P. McGowan, M.D., an orthopedic specialist.  Burkinshaw reported injuring his back at work in 2004, and again in November 2005.  (Tr. 478.)  Although Dr. McGowan observed some tenderness, spasms, and limited range of motion in Burkinshaw's spine, he noted that Burkinshaw was in "no acute distress."  (Tr. 478-79.)  Dr. McGowan

2

noted that Burkinshaw had been previously evaluated by Dr. Gutshall, who had ordered a magnetic resonance imaging ("MRI") scan of Burkinshaw's spine that showed no significant stenosis or significant disc herniation.  (Tr. 478.)  Dr. McGowan ordered an MRI of Burkinshaw's thoracic spine, and he wrote a note restricting Burkinshaw to lifting no more than fifty pounds and stating that Burkinshaw must be able to sit or stand as needed.  With those restrictions, Dr. McGowan allowed Burkinshaw to work full-time.  (Tr. 479.)

During a second examination on February 21, 2006, Dr. McGowan concluded that Burkinshaw probably suffered from central disc herniations, noting that he also had some pre-existing extremity and degenerative changes.  Dr. McGowan administered an epidural steroid injection to treat Burkinshaw's pain and prescribed physical therapy, which Burkinshaw began on February 24, 2006.  (Tr. 333–43, 480.)

Dr. McGowan again examined Burkinshaw on April 4, 2006.  He noted that test results were unremarkable, and that Burkinshaw was intact from a neurologic standpoint.  Dr. McGowan offered to repeat the MRI, but Burkinshaw declined.  Dr. McGowan noted spasms in Burkinshaw's lumbar spine during the examination.  Dr. McGowan instructed Burkinshaw not to bend, twist his back, or lift more than twenty-five pounds at work.  Dr. McGowan stressed that limiting heavy lifting was important.  He also prescribed Baclofen, a muscle relaxant.  (Tr. 344.)

On April 18, 2006, Dr. McGowan noted no significant changes.  Burkinshaw's pain was slowly improving, and the Baclofen had significantly helped his spasms.  Dr. McGowan prescribed physical therapy.  (Tr. 345.)  On April 28, 2006, a family practice physician observed "[r]eally minimal tenderness" in Burkinshaw's spine.  (Tr. 444.)

3

On May 2, 2006, Burkinshaw complained to Dr. McGowan of continued back, shoulder, and neck pain. Dr. McGowan observed good extremity strength, an upright gait, spine tenderness and spasms, and limited range of motion in the neck. He prescribed a repeat MRI of Burkinshaw's spine and continued him on Baclofen and Daypro. He also restricted Burkinshaw to light-duty work. (Tr. 357.)

An MRI of Burkinshaw's thoracic spine performed on May 10, 2006, showed stable disc disease in the thoracic spine (Tr. 257), while an MRI of his lumbar spine showed multilevel degenerative disc disease and spondylosis, and mild degenerative disc bulges in two levels resulting in mild stenosis. A comparison with Burkinshaw's 2005 MRI showed some slight progression at two levels, while the rest of the spine appeared stable. (Tr. 259.) An MRI of his cervical spine completed on May 19th showed moderate and mild stenosis. (Tr. 261.)

Dr. McGowan examined Burkinshaw again on June 13, 2006, and he observed no physical changes. He restricted Burkinshaw to a twenty-hour work week with light duty. He also restricted Burkinshaw to work that provided a sit/stand option and that did not involve lifting more than thirty-five pounds or performing overhead tasks. Dr. McGowan opined that Burkinshaw might never return to his previous strenuous work. (Tr. 360.)

During Dr. McGowan's next examination on June 27, 2006, Burkinshaw claimed he could not tolerate the ten-hour workdays his employer provided. Dr. McGowan restricted Burkinshaw to five-hour workdays. Burkinshaw was deciding whether to undergo cervical spine surgery. (Tr. 359.)

On July 25, 2006, Burkinshaw told Dr. McGowan that he had been fired from his job. The thoracic pain had improved, but Burkinshaw still had cervical pain. Dr. McGowan

4

prescribed epidural steroid injections, exercise, and Vicodin only at night. Burkinshaw was to continue taking Tramadol and Baclofen.  Dr. McGowan allowed Burkinshaw to work full-time with the following restrictions: no lifting greater than thirty-five pounds; sit/stand option; no work over the shoulder height; and no climbing, crawling, or working at dangerous and unprotected heights.  (Tr. 365.)

During his next appointment with Dr. McGowan on August 22, 2006, Burkinshaw reported that epidural injections improved, but did not eliminate, his symptoms.  He complained of pain and a burning sensation in his left hand that might have been related to the motion of his neck.  Dr. McGowan ordered diagnostic testing, continued wearing of a collar at night, and, at Burkinshaw's request, chiropractic treatment.  Work restrictions were unchanged. Dr. McGowan suggested that a two-level cervical fusion, although it most likely relieve only about sixty percent of his pain.  (Tr. 368.)

Dwight King, M.D., performed a neurological evaluation on September 29, 2006.  (Tr. 267–69.)  Burkinshaw demonstrated intact cranial nerves and sensation, a normal gait, good muscle tone and bulk, and intact strength aside from mild hip flexor weakness.  (Tr. 268.) Nerve-conduction studies provided no evidence of "significant neuropathic or neuromuscular disease," and an electromyogram (EMG) test showed no evidence of denervation or acute injury.  (Tr. 269.)

On October 17, 2006, Dr. McGowan noted that test results had been unremarkable He prescribed another cervical epidural injection, continued exercise, chiropractic care, the same work restrictions, and continued Vicodin at bedtime, Daypro, and Ultram.   Dr. McGowan again discussed the possibility of obtaining some relief with a cervical fusion.  (Tr. 369.)

5

Jay Allison, M.D., examined Burkinshaw on November 2, 2006.  Burkinshaw complained of worsening back pain.  Dr. Allison observed that Burkinshaw hardly moved his neck, was in mild to moderate distress, and exhibited some spasms in his back.  Dr. Allison diagnosed chronic back pain and radiculopathy.  The doctor also prescribed pain medication and muscle relaxants.  (Tr. 311.)

During an appointment on November 27, 2006, Dr. McGowan noted that Burkinshaw had tried all methods of conservative care and might benefit from a cervical fusion procedure.  Burkinshaw's examination revealed no changes.  After Burkinshaw requested the opportunity for a second opinion, Dr. McGowan referred him to Benjamin Gelber, M.D. (Tr. 375.)

Dr. Gelber evaluated Burkinshaw on December 14, 2006.  On examination, Burkinshaw had intact strength and reflexes and a normal gait.  Despite some loss of spinal range of motion, Dr. Gelber noted Burkinshaw's ability to move in all directions when urged. Dr. Gelber reviewed Burkinshaw's lab results and MRI scans, and he stated that none of the radiologists's findings from the MRI scans was "especially significant."  (Tr. 293.)  Dr. Gelber concluded that he could not diagnose Burkinshaw's impairment because he could "see nothing on scans or on exam to correlate with the patient's symptoms."  (*Id.*)  He recommended a computed tomography ("CT") scan of Burkinshaw's lumbar and thoracic spine in order to probe for ankylosing spondylitis.  (*Id*.)  CT scans on December 21, 2006, showed "mild" or "minimal" degenerative chances, no evidence of compression or destruction, and "no evidence of ankylosing spondylitis."  (Tr. 319-20.)

During an examination on January 10, 2007, Dr. Gelber noted that CT scans showed a minimal amount of calcification, and nothing else to suggest spondylitis although he

6

opined that Burkinshaw could still have an early case.  (Tr. 292.)  Dr. Gelber saw nothing to suggest  surgery.  He referred Burkinshaw for a rheumatology consultation.  (Tr. 296.)

Dr. McGowan examined Burkinshaw again on January 23, 2007.  He renewed Burkinshaw's Vicodin.  (Tr. 378.)

On January 30, 2007, Burkinshaw returned to Dr. Allison regarding an unrelated issue. He complained of numbness in his legs when he reclined.  Dr. Allison suggested that Burkinshaw talk with Dr. McGowan about trying a different pain medication.  (Tr. 312.)

When he saw Dr. McGowan on March 20, 2007, Burkinshaw reported a burning sensation in his feet and left arm.  Dr. McGowan also prescribed Lyrica, the pain medication Dr. Allison had mentioned.  Dr. McGowan remarked that Burkinshaw would never return to his regular work.  (Tr. 379.)

On March 20, 2007, Burkinshaw presented to Mark Ptacek, M.D., for a blood-pressure checkup.  Dr. Ptacek prescribed blood-pressure medication for Burkinshaw's high blood pressure.  (Tr. 397.)  During a follow-up appointment on March 28th, Dr. Ptacek assessed "very well controlled" hypertension.  (Tr. 396.)

Dr. McGowan next examined Burkinshaw on April 3, 2007.  He noted that Burkinshaw would try chiropractic evaluation and treatment.  Again, Dr. McGowan opined that Burkinshaw would never return to his regular occupation, and that "[v]ocational rehabilitation would be indicated."  (Tr. 380.)

Burkinshaw saw Dr. Allison again on April 24, 2007.  Dr. Allison noted that Burkinshaw had not yet taken the Lyrica that Dr. McGowan prescribed for pain.  He observed that Burkinshaw looked very stiff.  Dr. Allison also diagnosed depression.  He

7

encouraged Burkinshaw to start taking the pain medication, and to "pick one physician and stick with" that physician.  (Tr. 313.)

During a May 15, 2007, appointment with Dr. Allison, Burkinshaw reported increased pain following a fishing trip and sexual intercourse.  Dr. Allison noted extremely tight muscles in Burkinshaw's left back.  He also prescribed an antidepressant, Cymbalta.  (Tr. 314.)

On May 31, 2007, Dr. McGowan counseled Burkinshaw about cervical reconstruction surgery, but advised that it would not solve all of his problems and he still would not return to his previous work.  He also advised Burkinshaw to consider dorsal column stimulation treatment and, if possible, to avoid narcotics.  Burkinshaw promised to "think about" the dorsal column stimulation treatment.  (Tr. 381.)

On June 21, 2007, Burkinshaw complained to Dr. Allison of continued back pain. Burkinshaw claimed he had not filled his prescription for Cymbalta, the antidepressant, because it would not be covered by workers compensation.  Dr. Allison noted that Burkinshaw moved stiffly, yet had minimal tenderness in his back.  He gave Burkinshaw samples of Cymbalta as well as Celebrex for pain.  (Tr. 316.)

When Dr. McGowan examined Burkinshaw on June 26, 2007, Burkinshaw agreed to try dorsal column stimulation therapy.  (Tr. 382.)  On August 7th, Burkinshaw reported wrist and knee pain.  Dr. McGowan found that Burkinshaw's knees were tender, but stable with no crepitus during movement.  Dr. McGowan noted that Burkinshaw's insurer had not yet approved dorsal column stimulation.  They again discussed surgery, which Dr. McGowan thought might help.  Dr. McGowan noted that the first epidural injection helped, and he prescribed another.  (Tr. 383.)

8

On August 30, 2007, Burkinshaw saw Dr. Allison for continued back and neck pain. Burkinshaw had not yet tried samples of the antidepressant that Dr. Allison gave him more than two months earlier.  He did try the pain medication, Celebrex, and it helped.  Dr. Allison observed that Burkinshaw walked with a "good" gait.  Dr. Allison prescribed Celebrex.  (Tr. 315.)

Dr. McGowan again examined Burkinshaw on September 18, 2007.  Burkinshaw reported that a recent epidural injection worked well, although his symptoms recurred.   On examination Dr. McGowan noted little to no change.  A straight leg raise test was positive, and neck extension resulted in left arm pain.  Burkinshaw expressed interest in a cervical fusion procedure, and Dr. McGowan planned to seek authorization from Burkinshaw's insurer. (Tr. 469.) On November 6, 2007, Burkinshaw reported no changes.  He was taking Hydrocodone for pain, and he was put on the schedule for a one-month trial of dorsal column stimulation for leg pain.  (Tr. 470.)

Burkinshaw returned to Dr. McGowan again on December 18, 2007, with no changes.  Dr. McGowan again suggested dorsal column stimulation and a surgical fusion.  (Tr. 471.)

Dr. Allison next examined Burkinshaw on January 3, 2008.  Burkinshaw reported that he was running out of Hydrocodone.   Dr. Allison noticed that Burkinshaw was only taking Lyrica at bedtime.  Burkinshaw agreed to take his Lyrica as directed, but he refused to take an antidepressant.   Dr. Allison refilled Burkinshaw's Hydrocodone and Clonazepam prescriptions.  (Tr. 318.)

Dr. McGowan saw Burkinshaw again on January 22, 2008.  He noted no changes and refilled prescriptions.  (Tr. 472.)

Burkinshaw saw Dr. Allison on February 12, 2008.  Burkinshaw reported moderate pain that was worse in the mornings.  He reported that getting going in the mornings would make him cry about every two days.  Dr. Allison changed Burkinshaw's pain medications and noted that Burkinshaw was still trying to obtain approval for the trial dorsal column stimulator.  (Tr. 402.)

Dr. McGowan examined Burkinshaw again February 19, 2008.  Medications were renewed and authorization for the trial dorsal column stimulator was again discussed.  (Tr. 406.) During an appointment on March 18, 2008, Dr. McGowan noted that Burkinshaw had still not received approval for the dorsal column stimulator and stated that Burkinshaw might benefit from a cervical fusion.  (Tr. 407.)  Dr. McGowan observed no changes during an April 15, 2008, examination.  (Tr. 477.)

On April 17, 2008, A. R. Hohensee, M.D., a state agency physician, completed a physical assessment based on the medical record.  (Tr. 411–19.) Dr. Hohensee opined that Burkinshaw could lift ten pounds frequently and twenty pounds occasionally, and could stand and sit for about six hours in an eight-hour workday.  (Tr. 412.)  Dr. Hohensee indicated that Burkinshaw could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, and had limited ability to reach above shoulder level.  (Tr. 413-14.)   Dr. Hohensee explained that objective evidence of Burkinshaw's impairment was limited, and none of his degenerative disc changes indicated surgery.  He noted Burkinshaw's normal neurologic examination in 2006.  Dr. McGowan's most recent work limitations were basically consistent with light work.  In summary, Dr. Hohensee stated that Burkinshaw's allegations were not fully credible, his reported symptoms were out of proportion with objective medical evidence and inconsistent with Burkinshaw's statements that he could pick up around the

10

house, do laundry, sweep, use a riding lawn mower, and use a weed whacker.  Dr. Hohensee opined that Burkinshaw could work, consistent with Dr. McGowan's opinion.  (Tr. 418.)  On June 26, 2008, Roderick Harley, M.D., a second state agency physician, affirmed Dr. Hohensee's assessment.  (Tr. 524.)

Paul Adams, Ed.D., a psychologist, performed a consultative psychological examination on May 2, 2008.  (Tr. 420-29.)  Dr. Adams noted that medical notes indicated medications were "neglected."  He diagnosed severe depression and an anxiety disorder.  (Tr. 429.)

Dr. McGowan examined Burkinshaw again on May 13, 2008.  Burkinshaw reported continued pain.  (Tr. 441.)

On May 19, 2008, Christopher Milne, Ph.D., a state agency psychologist, completed a mental assessment based on the record.  (Tr. 495–99, 509–22.)  Dr. Milne indicated that Burkinshaw had a depressive disorder and a social anxiety or phobia, which caused moderate limitations in his ability to maintain social functioning and concentration, persistence, or pace.  (Tr. 512, 514, 519.)

When Dr. Allison next saw Burkinshaw June 10, 2008, he observed tightness and spasms in Burkinshaw's back.  Straight-leg-raise tests were negative, and Dr. Allison noted that Burkinshaw had brisk reflexes.  (Tr. 463.)

On June 24, 2008, Burkinshaw reported possible improvement in leg pain to Dr. McGowan.  Dr. McGowan noted no changes upon examination.  (Tr. 562.)  He examined Burkinshaw again on July 29, 2008, and once again dorsal column stimulation and a possible cervical fusion were discussed.  (Tr. 561.)

11

Burkinshaw returned to Dr. Ptacek on August 5, 2008.  Dr. Ptacek noted that Burkinshaw made the appointment "basically to discuss a dorsal column stimulator."  (Tr. 625.) Dr. Ptacek noted that Burkinshaw knelt throughout his examination because he could not sit or stand.  Dr. Ptacek observed that Burkinshaw had decreased range of motion in his back, "some" positive straight leg raise results, and no obvious weakness.  He diagnosed persistent neck and back pain and continued Burkinshaw's medications. Burkinshaw refused to go to physical therapy, as recommended, because he said it would make his pain worse.  (Tr. 625.)  Dr. Ptacek also completed questionnaires at the request of Burkinshaw's attorney.  (Tr. 528–30, 531–33.)  He noted that although he had treated Burkinshaw for three years he had not seen him on a regular basis.  (Tr. 528.)  Dr. Ptacek indicated, in part, that Burkinshaw had to recline for eighty percent of the workday, and would have to change from sitting to standing every ten minutes.  He also claimed that Burkinshaw could "seldom" lift objects weighing less than ten pounds, never lift objects weighing more than ten pounds and could never bend, squat, crawl, or climb. (Tr. 531.)

During an October 7, 2008, appointment with Dr. McGowan, Burkinshaw reported that he had stopped taking three of his medications because they made him feel tired.  Dr. McGowan observed no changes since the previous examination.  (Tr. 560.)  Again on November 4, 2008, Dr. McGowan observed no changes.  (Tr. 559.)  Although Dr. McGowan noted no changes upon examination, Burkinshaw reported some improvement in cervical pain on December 23, 2008.  (Tr. 558.)

Dr. Allison next examined Burkinshaw on January 15, 2009.  (Tr. 663–64.)  He noted that Burkinshaw knelt during the examination and had a stiff neck and diminished grip strength.  (Tr. 663.)  Dr. McGowan saw Burkinshaw again on January 27, 2009, and noted

that Burkinshaw had still not been approved for dorsal column stimulation.  (Tr. 557.)
Burkinshaw reported continued neck and arm pain on February 17, 2009, and Dr. McGowan
observed no changes during his physical examination.  (Tr. 556.)  Dr. McGowan examined
Burkinshaw again on April 1, 2009.  His physical examination revealed no changes.  Dr.
McGowan advised Burkinshaw not to use narcotic pain medication during the day if he
returned to sedentary work.  (Tr. 671.)  Burkinshaw told Dr. McGowan he would like to be
treated with conservative care and go through a vocational rehabilitation program.  During
appointments on May 12 and June 23, 2009, Burkinshaw noted that he was stressed due
to the workers compensation process, and Dr. McGowan observed no changes during his
examinations.  (Tr. 669-70.)

Dr. Allison saw Burkinshaw again on June 2, 2009.  (Tr. 661-62.)  Burkinshaw
reported severe pain in his buttocks and requested a trial of a different pain medication.  Dr.
Allison noted that Burkinshaw kneeled during the appointment, and had tenderness to
palpation in his lumbar region.  Dr. Allison prescribed Celebrex, the pain medication
Burkinshaw wanted to try in addition to the three pain medications he was already taking.
(Tr. 661.)

On July 23, 2009, Burkinshaw told Dr. Allison that he had begun to exercise, which
caused him more pain.  Dr. Allison observed that Burkinshaw stood "with his torso cocked
off to the left," and knelt down later during the appointment.  He observed tightness in the
muscles of Burkinshaw's lumbar spine.  (Tr. 659.)

Burkinshaw saw Dr. McGowan again on September 8, 2009.  Dr. McGowan noted
that Burkinshaw preferred to follow a conservative approach to further care, and he noted
that he would send Burkinshaw for a functional capacity evaluation.  (Tr. 667.)

13

On September 14, 2009, Burkinshaw's attorney sent a letter to Dr. Ptacek which asked him whether his opinions about Burkinshaw's functioning had changed.  Dr. Ptacek responded "no."  (Tr. 672.)

Jake DeNell, PT, completed a functional capacity evaluation at Dr. McGowan's request on October 1, 2009, after interviewing Burkinshaw and reviewing Dr. McGowan's records and MRI reports.  (Tr. 676–80.)  Burkinshaw told Mr. DeNell that he had to give up fishing, golf, and jogging due to pain.  (Tr. 677.)  Mr. DeNell observed that Burkinshaw had reduced spine range of motion, and experienced difficulty when asked to walk on his heels and toes.  Mr. DeNell observed evidence of "inconsistent" effort on Burkinshaw's part, including give-way weakness during strength testing.  (Tr. 678.)  Mr. DeNell also noted that he had a reviewed surveillance video from August 20 and 22, 2009, in which Burkinshaw went fishing and performed maintenance on a vehicle.  Mr. DeNell noted that video showed Burkinshaw could bend for extended periods without apparent discomfort, and could twist, stoop, crouch, and squat without restriction.  (Tr. 679.)  Mr. DeNell also noted that the video showed Burkinshaw sitting on rocks for extended periods of time with no apparent discomfort, and "effortlessly" lifting a five-gallon bucket with one hand.  Mr. DeNell noted "significant" discrepancies between Burkinshaw's reported abilities and those depicted in the video.  (Tr. 679-80.)  Mr. DeNell concluded that Burkinshaw could: lift and carry up to fifty pounds on an occasional basis; sit, stand, and walk throughout the workday without restrictions; crawl occasionally; and squat, kneel, climb, and reach without limitation.  (Tr. 679–81.)  He found that Burkinshaw was limited to the medium to heavy range of work.  (Tr. 681.)

14

Dr. McGowan examined Burkinshaw again on October 7, 2009.  (Tr. 673–74.)  Dr. McGowan indicated that he found Mr. DeNell's evaluation "almost outrageous."  (Tr. 673.)  In referring to the video discussed in Mr. DeNell's evaluation, Dr. McGowan stated "[e]veryone has good moments" and that he had encouraged Burkinshaw to go out fishing.  (*Id.*)  Dr. McGowan added that Burkinshaw was "not totally disable[d]," and could "certainly do things."  (*Id.*)  He disagreed with Mr. DeNell's assessment, opining that Burkinshaw could perform sedentary work and lift a maximum of twenty-five pounds occasionally.  However, Dr. McGowan stated that Burkinshaw required a sit/stand option and could climb, work around hazards, or lift objects above shoulder height.  He also specified that Burkinshaw could work a maximum of four hours per day.  (Tr. 673.)

**Burkinshaw's Testimony**

Burkinshaw testified that he last worked weatherizing homes for ten years until he was fired on July 31, 2006.  (Tr. 26.)  He said he worked full-time until April 2006, when he left to begin physical therapy.  He said he returned in mid-June for a few days, but he was unable to do the work.  (Tr. 26-27.)   He testified that he was experiencing a "dull, aching nerve pain" and his pain level was at a five on a scale of zero to ten.  He said in the morning his pain level is eight, and after pain medications it decreases to between five and seven.  Burkinshaw said his daily activities consist of mostly lying on the couch, doing dishes, cooking, mowing with a riding mower, and helping with house cleaning.  (Tr. 30.)  He is alone most of the day as his wife works full-time.  (Tr. 30-31.)  Burkinshaw testified that he can sit for fifteen to twenty minutes, stand for three to five minutes, and walk four to six blocks.  (Tr. 31.)  He said he had trouble climbing stairs, ladders could probably be managed with some pain, and he could not climb on ropes or scaffolding.  (Tr. 32-33.)

15

Burkinshaw thought he could lift ten pounds frequently and twenty-five pounds occasionally. (Tr. 32.)

Burkinshaw also testified that he has nerve pain running from his shoulders into his fingers, and the pain extends into his neck.  Burkinshaw said most of his arm pain was on the left side, and occasionally he has it on the right side.  (Tr. 33.)

Burkinshaw testified that he experiences depression or anxiety.  (Tr. 34.)  He testified that he was not receiving mental health treatment, and had never mentioned the condition to Dr. McGowan.  Burkinshaw claimed he would not take antidepressants because they made his condition worse.  He said he last took antidepressants in 2004, although he rated his mental condition as "severe."  (Tr. 34-35.)  Burkinshaw said he misses doing certain things, including power walking and jogging.  (Tr. 38.)  He stated that he still fishes, but with difficulty.  (Tr. 39.)  He feels that he is under a lot of stress.  (Tr. 40.)

**Vocational Expert's Testimony**

The ALJ asked the vocational expert, Julie Svec,[2] to consider a hypothetical claimant of the same age, education, and work experience as Burkinshaw who could perform light work, but required a sit/stand option and could lift less than ten pounds frequently and twenty pounds occasionally.  The ALJ also specified that the hypothetical claimant could occasionally climb stairs, handle objects, and lift with his left hand.  The individual could not lift overhead on a prolonged basis.  (Tr. 41.)  The vocational expert testified that the hypothetical claimant could not perform Burkinshaw's past work as a weatherization technician.  However, the individual could perform other jobs including: parking-lot attendant

---

[2]The vocational expert's curriculum vitae is in the record.  (Tr. 94-97.)

(350 jobs in the region and 18,000 nationwide); and pricer or tagger (1,000 jobs in the region and 50,000 nationwide).  (Tr. 42.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. § 404.1520, the ALJ concluded that Burkinshaw was not disabled from April 4, 2006, through the date of decision.  (Tr. 16.)  At step one the ALJ found that Burkinshaw had not performed substantial gainful work activity since his alleged onset date of April 4, 2006.  At step two, the ALJ found the following severe impairments: back pain extending into Burkinshaw's legs; and depression.  (Tr. 11.)  At step three, the ALJ found that Burkinshaw's medically determinable impairments, either singly or collectively, did not meet Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings."  The ALJ determined that Burkinshaw: had the residual functional capacity ("RFC") to: lift twenty pounds occasionally and ten pounds frequently;  sit for six to eight hours daily and stand or walk for six out of eight hours daily with a sit/stand option and intermittent breaks; occasionally climb stairs;  occasionally handle with limitations of the left hand; and occasionally reach and do overhead reaching, but not on a prolonged basis.  The ALJ concluded that Burkinshaw cannot climb ladders, ropes, or scaffolds. (Tr. 13.) At step four, the ALJ determined that Burkinshaw could not perform his past relevant work as a weatherizing technician.  The ALJ concluded, however, that Burkinshaw could perform the jobs of parking lot attendant and pricer or tagger, noting that both jobs exist in significant numbers in the local and national economies. (Tr. 15-16.)  The ALJ found that Burkinshaw was not disabled and met insured status requirements through December 31, 2011.  (Tr. 11, 16.)

17

**STANDARD OF REVIEW**

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue,* 499 F.3d 835, 839 (8th Cir. 2007).

"'Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.'" *Slusser v. Astrue,* 557 F.3d 923, 925 (8th Cir. 2009) (quoting *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006)). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue,* 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Fredrickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004).

**DISCUSSION**

**I.     Opinion of Treating Physician**

Burkinshaw argues that the ALJ erred by not accepting the opinions of his treating orthopedist, Dennis P. McGowan, "whose limitations fairly nearly parallel" his own testimony. (Filing No. 12, at 11.) Burkinshaw adds that, in doing so, the ALJ did not follow the requirements of Social Security Ruling ("SSR") 96-2p and provided a very limited basis for rejecting Dr. McGowan's opinion. Burkinshaw contends that the ALJ relied not on the

treating physician's opinion but rather on that of Jake DeNell, PT, OCS, CWCE, who performed a one-time residual functional capacity evaluation. Burkinshaw claims that Dr. McGowan's, rather than DeNell's, opinion is supported by the medical evidence. Burkinshaw also argues that the ALJ failed to discuss Dr. Ptacek's opinion.

20 C.F.R. § 404.1527(d)(2) provides that a treating physician's opinion is given controlling weight if "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."

Section 404.1527(d)(2) states that in evaluating a treating source's opinion, the following factors are considered: length and frequency of treatment by the physician; the nature and extent of the treatment relationship; the degree of medical evidence supporting the opinion; the consistency of the opinion with the record as a whole; whether the treating source is a specialist in the area in question; and other factors brought to attention. 20 C.F.R. § 404.1527(d)(2)(i) & (ii), (d)(3)-(6).

Social Security Ruling 96-2p provides:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well- supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well- supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

SSR 96-2p, 1996 WL 374188, at *1 (Soc. Sec. Admin. July 2, 1996).

The ALJ's rejection of Dr. McGowan's statements regarding Burkinshaw's alleged disability is based on, and is supported by, numerous parts of the record.  The record is replete with evidence inconsistent with those opinions, as noted in the factual summary of the record above.  For example:

- Burkinshaw performs basic chores such as doing dishes, cooking, mowing with a riding mower, helping with house cleaning, and using a weed whacker;

- although Burkinshaw reported giving up fishing according to medical records, he was seen in a surveillance video fishing on two different days for extended periods with no apparent difficulty;

- the surveillance video reportedly showed Burkinshaw lifting a large bucket effortlessly with one hand, sitting on rocks for an extended period, bending, stooping, crouching and squatting without apparent discomfort;

20

- Burkinshaw refused on numerous occasions to take antidepressants, did not receive other mental health treatment, and did not raise mental health concerns to his treating physicians;

- Burkinshaw refused to undertake physical therapy;

- Burkinshaw appears to have at least initially not assisted in requesting approval for dorsal column stimulation and a surgical fusion; and

- Burkinshaw eventually decided to have his physical ailments treated conservatively.

For these reasons, the Court concludes that the ALJ was correct in not giving controlling weight to Dr. McGowan's opinion as Burkinshaw's treating physician. The consultative opinion of the physical therapist, DeNell, more closely reflects the medical record.

Burkinshaw's argument that the ALJ did not discuss Dr. Ptacek's opinions is misplaced. Dr. Ptacek noted that he was not treating Burkinshaw regularly.

## II.  Application of *Polaski*

Burkinshaw argues that the ALJ failed to cite to legal authority for the applicable standard of review. Burkinshaw also contends that the ALJ failed to consider the factors set out in *Polaski* relating to: his daily activities; the duration, frequency and intensity of pain; dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; and functional restrictions when evaluating his subjective complaints, or related inconsistencies.

There is no requirement that an ALJ cite the *Polaski* decision or discuss every *Polaski* factor. It is sufficient if *Polaski* factors are referenced and considered and that an

ALJ's credibility findings are adequately explained and supported. *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000).

In this case, the ALJ cited to the applicable Social Security regulations. He listed and discussed the five steps of the required sequential evaluation process for determining whether an individual is disabled. He then set out his detailed findings of fact and conclusions of law in which he considered each of those required steps. In doing so he made detailed references to the medical record in discussing the regulations, inconsistencies with Burkinshaw's subjective complaints of pain and Dr. McGowan's opinions (which the ALJ correctly noted are based on Burkinshaw's own complaints rather than on objective medical evidence). The *Polaski* factors were considered.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment in favor of the Defendant will be entered in a separate document.

DATED this 11th of April, 2011.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

22